1   NANCY J. JOHNSON, CA STATE BAR NO. 111615
    CHRISTIAN E. PICONE, CA STATE BAR NO. 218275
2   BERLINER COHEN
    TEN ALMADEN BOULEVARD
3   ELEVENTH FLOOR
    SAN JOSE, CALIFORNIA 95113-2233
4   TELEPHONE: (408) 286-5800
    FACSIMILE: (408) 998-5388
5   nancy.johnson@berliner.com
    christian.picone@berliner.com
6
    ATTORNEYS FOR CROSS-DEFENDANT STEWART TITLE OF
7   CALIFORNIA, INC.

8

9                       UNITED STATES DISTRICT COURT

10                     NORTHERN DISTRICT OF CALIFORNIA

11                         SAN FRANCISCO DIVISION

12   FLAGSTAR BANK, FSB, A FEDERALLY          CASE NO.  C10-3190 CRB
     CHARTED SAVINGS BANK,
13                                            CROSS-DEFENDANT STEWART TITLE'S
                   Plaintiff,                 MOTION IN LIMINE NO. 1 TO PRECLUDE
14                                            CERTAIN TESTIMONY OF MR.
          v.                                  MCAULEY AND ANY OTHER EXPERT
15                                            WITNESS REGARDING STATEMENTS
     THE LOAN EXPERTS CORPORATION,            MADE TO MR. MCAULEY BY JOSEPH
16   d/b/a ALL AMERICAN FINANCE, a            LATHROP
     California corporation, HORMOZ NAZARI,
17   an individual, ELIZABETH CORTEZ
     PADILLA, an individual, 1350 ESCONDIDO
18   COASTAL, LLC, a California limited liability
     company, WESTLAKE COASTAL, LLC, a
19   California limited liability company, VCH-
     SALINAS 1, LLC, a California limited
20   liability company, ALLSTAR APPRAISALS,
     INC., a California Corporation, JAMES MAY,
21   an individual, STEWART TITLE OF
     CALIFORNIA, a California corporation,
22
                   Defendants.
23

24   AND RELATED CROSS-ACTION.

25

26   ///

27   ///

28   ///

CASE NO.  C10-3190 CRB                        -1-

CROSS-DEFENDANT STEWART TITLE'S MOTION IN LIMINE NO.1

I.      INTRODUCTION

Cross-Defendant Stewart Title of California, Inc. (Stewart Title) hereby moves for an *in limine* order to exclude Cross-Claimant The Loan Experts Corporation's ("TLE") designated expert Michael McAuley and other expert witnesses from (a) testifying about the content of a conversation Mr. McAuley had with Flagstar Bank employee Joseph Lathrop, or conversations with anyone else from Flagstar Bank, and (b) mentioning such communications as support for expert opinions. Mr. Lathrop is not expected to testify at trial and was not deposed. Testimony from any non-expert witness about statements made by Mr. Lathrop would be inadmissible under the hearsay rule, and TLE may not circumvent that rule by having its experts offer the hearsay evidence. Although under some circumstances experts may rely on hearsay, those circumstances do not exist here, as will be discussed below.

II.     RELEVANT FACTS

TLE was a mortgage banker which, at the beginning of 2008, had a warehouse line of credit with Flagstar Bank as its lender. TLE used that line of credit to obtain funds to close loans made to borrowers secured by residential real property, with TLE as the lender. Very soon after the loan closed, TLE would sell the loan to another lender (usually Flagstar Bank) and funds from that loan sale transaction would then repay the draw on the warehouse line of credit. In May and June 2008, TLE originated a series of loans which were closed in June and July 2008 through escrows at Stewart Title. The loans were part of a straw buyer loan fraud scheme, and a Stewart Title escrow officer provided some assistance in facilitating the scheme. Through this action, TLE claims that Flagstar Bank terminated its warehouse line of credit after the discovery of, and because of, fraud in at least one loan transaction. TLE further claims that the loss of the warehouse line caused it to go out of business. It has sued Stewart Title for fraud, seeking to hold Stewart Title responsible for the lost profits it asserts it would have achieved had Flagstar Bank not terminated the warehouse line of credit.

Evidence in this case includes a letter signed by Joseph Lathrop from Flagstar Bank dated April 2, 2008 notifying TLE that Flagstar Bank was terminating the warehouse line of credit due to financial losses TLE had experienced in 2007 and "high lock fallout," which is a term

\CEP\1063378.1
090912-13139033

referring to TLE's failure to deliver loans to Flagstar after registering the loan with Flagstar Bank before funding. That letter was sent a month *before* the origination of the straw buyer loans, and several months before the suspicion of fraud. The timing of the April 2, 2008 letter and related evidence establish that the termination of the line of credit could not possibly have been precipitated by the submission of the straw buyer loans to Flagstar Bank. Moreover, Flagstar Bank's stated reasons for the termination have nothing to do with fraudulent loans or Stewart Title. This evidence contradicts TLE's entire theory against Stewart Title, yet TLE persists in its claims.

During the course of expert discovery, TLE produced a report from expert Michael McAuley who is a consultant with a background in mortgage warehouse lending. Mr. McAuley's report offered several opinions, one of which was "whether to a reasonable probability Flagstar would have cancelled The Loan Experts' warehouse line of credit absent allegations of fraud." In addressing that particular opinion, Mr. McAuley referenced a telephone conversation he had with Joseph Lathrop, who was the author of the April 2, 2008 termination notification letter. That telephone call occurred on April 4, 2012—four years after Mr. Lathrop's April 2, 2008 letter to TLE. Mr. McAuley uses the content of his conversation with Mr. Lathrop as support for opinions he expressed in his report and at his later deposition.

For the reasons discussed below, Mr. McAuley and the other experts should be precluded from testifying about that conversation, and all experts disclosed by TLE should be precluded from relying on that conversation (or any other similar conversations with Flagstar Bank representatives) as support for any expert opinions expressed at trial.

III.   TESTIMONY ABOUT MR. MCAULEY'S CONVERSATIONS WITH MR. LATHROP EXCEEDS THE BOUNDS OF PERMISSIBLE EXPERT DISCOVERY

Under Federal Rule of Evidence 703, experts may rely on inadmissible evidence (e.g., hearsay) only in certain circumstances, which were described by the Ninth Circuit as follows:

> In December 2000, Rule 703 was amended and now requires a court to ask two questions when evaluating otherwise inadmissible evidence. The first question is 'whether the facts are of a type reasonably relied on by experts in the particular field.' [Citation.] The second question is whether the probative value of the underlying data substantially outweighs its prejudicial effect. [Citation.]

\CEP\1063378.1
090912-13139033

1    Turner v. Burlington Northern Santa Fe Railroad Co., 338 F.3d 1058, 1061-62 (9th Cir. 2003).

2    In Turner, the expert (Howard) sought to testify that a fire was caused by arson based on

3    hearsay--i.e., a lab report showing that one of the "debris samples contained a mixture of

4    petroleum distillate consistent with gasoline." Turner, 338 F.3d at 1060. The district court

5    excluded the evidence "because Howard relied on the lab report as substantive evidence to prove

6    that the fire was started by gasoline." Id. The Ninth Circuit affirmed the exclusion stating:

7              The lab report was the only evidence of gasoline in the soil.
              Howard used the report not as data upon which an expert in his
8              field would reasonably rely in forming an opinion, but rather
              intended to use it as substantive evidence of his ultimate
9              conclusions that the fire was intentionally created by pouring
              gasoline into the soil. The lab report was otherwise inadmissible
10             hearsay evidence in the absence of foundation testimony by the
              laboratory that conducted the testing. The prejudice that would
11             result from admission of this evidence was substantial, whereas its
              probative value was minimal. Because the probative value of this
12             otherwise inadmissible evidence does not outweigh its prejudicial
              effect, our inquiry is ended under [F.R.E. Rule 703].
13
     Id. at 1062.
14

15        Here, TLE, through use of an expert, seeks to introduce the expert's rendition of a

16   conversation with Mr. Lathrop as evidence that Flagstar did not mean what it said in its April 2,

17   2008 letter, and to create evidence that the termination of the warehouse line occurred later for

18   different reasons than those stated in Flagstar's written communications to TLE.  There is no

19   exception to the hearsay rule that would make Mr. Lathrop's comments to Mr. McAuley

20   admissible.    Mr. Lathrop's purported statements should not be disclosed through expert

21   testimony as a basis for his opinion because common sense dictates that they cannot be the type

22   of factual statements on which a warehouse lending expert would rely to form opinions about

23   reasons for a warehouse line termination when those reasons have already been stated in a letter

24   sent contemporaneous with the termination decision. Further, the context in which the statement

25   was given is highly suspect because the conversation occurred four years after Flagstar's

26   announced termination decision and there is no corroborating evidence that was provided near or

27   around the time of the interview, such as a written statement or a detailed analysis of the specific

28   questions asked and the exact answers given. The conversation between Mr. McAuley and Mr.

1    Lathrop comes no where close to having the same degree of trustworthiness as the statements in

2    the letter that Mr. Lathrop signed on April 2, 2008 and should be excluded because it is

3    unreliable, under concepts expressed in <u>Daubert v. Merrill Dow Pharms., Inc.</u> 509 U.S. 579, 588

4    (1993) and <u>Kumho Tire Co., Ltd. v. Carmichael</u> 526 U.S. 137, 147 (1999) (trial courts are

5    gatekeepers with regard to admission of expert testimony to ensure that such testimony is both

6    relevant and reliable.)   It would also be prejudicial to allow this type of evidence because it is

7    clearly intended to contradict key evidence that establishes the lack of proximate causation

8    between any conduct by Stewart Title and TLE's loss of its warehouse line of credit, without

9    affording Stewart Title the right to cross-examine Mr. Lathrop.   There is no admissible evidence

10   that Flagstar ever rescinded the termination decision it announced through its April 2, 2008

11   letter, or that Flagstar's stated reasons for termination were other than those it stated.   Unless the

12   hearsay statements from Mr. Lathrop are accepted as fact the statements have no probative value

13   whatsoever.   In the <u>Turner</u> case discussed above, the Court found there was no probative value of

14   the laboratory report finding gasoline in the soil unless the results were taken as true, and the

15   same rationale applies in this case.   Testimony about conversations with Mr. Lathrop would be

16   inadmissible if a non-expert sought to introduce them, and that exclusion may not be

17   circumvented through the testimony of an expert.

18   IV.   <u>OTHER EXPERTS SHOULD BE PRECLUDED FROM MENTIONING OR RELYING</u>
         <u>ON THE CONTENT OF MR. MCAULEY'S CONVERSATION WITH MR.</u>
19       <u>LATHROP</u>

20       TLE's experts' opinions are stacked like a house of cards.   Mr. McAuley has rendered

21   certain opinions upon which two of TLE's other experts (Joseph Garrett and Randy Sugarman)

22   then rely as foundation for their opinions.   Both Mr. Garrett and Mr. Sugarman have mentioned

23   Mr. McAuley's April 2012 conversation with Mr. Lathrop in expressing their own opinions, and

24   have accepted Mr. Lathrop's reported 2012 statements as fact.   If Mr. McAuley cannot testify

25   about his conversation with Mr. Lathrop or rely upon Mr. Lathrop's purported statements then

26   certainly no other expert can do so either.   In addition, references by Mr. Garrett and Mr.

27   Sugarman to the McAuley-Lathrop conversation expand the hearsay problem into the realm of

28   double hearsay.   Stewart Title therefore requests that the *in limine* order extend to all experts so

1    that none of them mention or express reliance on the hearsay statements attributed to Mr.

2    Lathrop.

3    V.    CONCLUSION

4         For the reasons expressed above, Stewart Title requests an *in limine* order to exclude

5    TLE's designated expert Michael McAuley and other expert witnesses from (a) testifying about

6    the content of the conversation Mr. McAuley had with Flagstar Bank employee Joseph Lathrop,

7    or conversations with anyone else from Flagstar Bank, and (b) mentioning such communications

8    as a basis for expert opinions.

9    DATED:  SEPTEMBER 14, 2012             BERLINER COHEN

10

11                                      BY:  /s/CHRISTIAN E. PICONE
                                             NANCY J. JOHNSON
12                                           CHRISTIAN E. PICONE
                                             ATTORNEYS FOR CROSS-DEFENDANT STEWART
13                                           TITLE OF CALIFORNIA, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    MARK B. FREDKIN, ESQ. (SBN 53550)
     WILLIAM SIAMAS, ESQ. (SBN 133111)
2    DAVID A. KAYS, ESQ. (SBN 120798)
     FREEDA Y. LUGO, ESQ. (SBN 244913)
3    MORGAN, FRANICH, FREDKIN & MARSH
     99 Almaden Boulevard, Suite 1000
4    San Jose, California 95113-1613
     Telephone: (408) 288-8288
5    Facsimile: (408) 288-8325

6    Attorneys for Defendants and Cross-Claimants
     HORMOZ NAZARI and THE LOAN EXPERTS
7    CORPORATION dba ALL AMERICAN FINANCE

8               UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10   FLAGSTAR BANK, FSB, a Federally     |   CASE NO. C10-3190 CRB (DMR)
     Chartered Savings Bank,

11                      |   **CROSS-CLAIMANTS THE LOAN**
           Plaintiff,          |   **EXPERTS CORPORATION AND**
12                      |   **HORMOZ "ALLEN" NAZARI'S**
           v.               |   **OPPOSITION TO STEWART TITLE'S**
13                      |   **MOTION TO PRECLUDE CERTAIN**
     THE LOAN EXPERTS CORPORATION,   |   **TESTIMONY OF MR. MCAULEY AND**
14   d/b/a ALL AMERICAN FINANCE, a      |   **ANY OTHER EXPERT WITNESS**
     California corporation, HORMOZ       |   **REGARDING STATEMENTS MADE TO**
15   NAZARI, an individual, ELIZABETH    |   **MR. MCAULEY BY JOSEPH LATHROP**
     CORTEZ PADILLA, an individual, 1350   |
16   ESCONDIDO COASTAL, LLC, a        |   **(Motion in Limine No. 1)**
     California limited liability company,    |
17   WESTLAKE COASTAL, LLC, a         | ————————————
     California limited liability company, VCH- |
18   SALINAS 1, LLC, a California limited    |
     liability company, ALLSTAR           |
19   APPRAISALS, INC., a California        |   Trial Date:     October 15, 2012
     Corporation, JAMES MAY, an individual, |   Courtroom:    6
20   STEWART TITLE OF CALIFORNIA, a    |   Judge:        Hon. Charles R. Breyer
     California corporation,,            |
21                      |   Complaint Filed: Michigan 1/26/2010
           Defendants.        |                      USDC/SF 7/21/2010
22   ————————————————— |
     AND RELATED CROSS-ACTION.      |
23   ————————————————— |

24

25

26

27

28

                              -0-

## I.   INTRODUCTION AND FACTUAL BACKGROUND

Incomplete statement of the facts.  A sketchy recitation of law.  This is what the defense gives the court in its attempt to preclude the admission of relevant, statutorily admissible evidence provided by Counter-Claimants' expert Michael McAuley.  To understand why the defense motion is so misguided the Court needs the complete factual background in which this motion is to be decided and a more complete exposition of the legal precepts which guide the resolution of the evidentiary issue raised.  The facts, which Counter-Claimants will offer to the court through multiple witnesses and documents are the following:

1.    The Loan Experts ("TLE"), was in the mortgage banking business for over 19 years.  It made hundreds of millions of dollars of loans.  It never made subprime loans and it never had a problem with any of the thousands of loans it placed prior to July 2008.

2.    The method of TLE's business, at the relevant times, involved obtaining mortgage applications primarily through independent and/or employee loan brokers.  TLE would fund the loans from its own money obtained through what is known as a Warehouse Line of Credit.  That loan would then be sold within days or less to banks with which TLE had a correspondent banking relationship.  TLE had had multiple warehouse lines of credit with various financial institutions over the years.  In 2006 it reinitiated a relationship it previously had with Flagstar Bank, FSB ("Flagstar" or "Flagstar Bank").  TLE had a $5.5 million line of credit for its warehouse funding with Flagstar.  TLE also had a correspondent relationship with Flagstar Bank. This meant that loans funded with a line of credit from Flagstar Bank would almost always be purchased by Flagstar Bank through a Correspondent Purchase Agreement, and thus Flagstar money would be used to pay Flagstar's line of credit given to TLE.  The warehouse lending aspects of Flagstar Bank were headed by an individual named R. Joseph Lathrop ("Mr. Lathrop").  Counter-Claimant Hormoz "Allen" Nazari ("Nazari"), the sole owner of TLE, had known Mr. Lathrop for many years and would often talk to him directly, as First Vice President of Flagstar's Commercial Warehouse lending division, about aspects of the Flagstar/TLE lending relationship.

-1-

Opposition to Motion in Limine No. 1

3.     Each year TLE provided Flagstar with its prior year's financial statement.   In early 2008, TLE provided its financial statement to Flagstar. TLE's audited financial statement for 2007 showed that TLE had suffered a loss.[1]   As will be noted by several experts who testify in this trial, 2007 was one of the worst mortgage lending markets in the last 50 years.  Almost every mortgage banker reported losses as a result of the 2007 business environment.

4.     Flagstar Bank sent a form letter to TLE on April 2, 2008, indicating an intent to terminate TLE's warehouse line of credit as of May 1, 2008.

5.     It is in the language of the April 2nd letter that the defendants stake their "lack of causation" argument.  Stewart Title posits that TLE's damage case is based on harm allegedly caused to it from the loss of the Flagstar warehouse line as a result of  TLE's lending on real estate transactions that were generated through the  fraudulent scheme in which Stewart Title's Branch Manager participated.  If the loss of TLE's credit facility occurred before the fraud was uncovered, argues Stewart Title, there can be no causal relationship with the fraudulent schemes. As pointed to in opposition to Stewart Title's motion for summary judgment, this argument incorrectly captures Counter-Claimants' causation position, (*i.e.*, irrespective of whether Flagstar cancelled TLE's line of credit or not, the fact is that TLE was denied *any* ability to get lines of credit because it was ensnared in the fraudulent transactions that should never have visited TLE's door.  If Stewart Title had done its job rather than participate in the fraud, there would be no stigma that would have attached to TLE because there would have been no loans by TLE on these tainted transactions).  Putting aside the fact that Stewart Title has erroneously characterized Counter-Claimants' causation case, it is true the April 2nd Flagstar letter will raise an issue in the case.

6.     Mr. McAuley will provide expert testimony concerning the industry context in which this letter was written, and the purpose behind banks such as Flagstar sending letters such as the April 2nd letter.  Mr. McAuley is uniquely qualified to provide such insight.  A graduate of Georgetown University with a major in Finance and a recipient of the Best Student Award from

---

[1] On an operational basis TLE did not suffer a loss, but from an accounting standpoint the loss was appropriate and was reported.

-2-

1    the Mortgage Banking Association's School of Mortgage Banking, Mr. McAuley has worked for

2    banks and for mortgage bankers for more than 24 years. He was an Assistant Vice-President for

3    Irving Trust Company in New York, was first Vice-President and Senior Account Officer for

4    First Collateral Services, a warehouse credit facility for single family mortgages. He worked for

5    Washington Mutual and United Bank of Texas in regard to correspondent and warehouse lending

6    and helped develop WAMU into the nation's largest warehouse lender, into the multi-billions.

7    He was at JP Morgan/Chase running Chase's warehouse lending department. He was the

8    Chairman of the Warehouse Lenders Roundtable, an industry forum of mortgage warehouse

9    lenders and has consulted with hundreds of banks, warehouse lenders and mortgage bankers

10   dealing with issues concerning warehouse and correspondent bank lines of credit. In particular,

11   Mr. McAuley had business relationships with Flagstar Bank during 2006 to 2008 and is a

12   business associate of Mr. Lathrop with whom Mr. McAuley has dealt in the past. In this context,

13   Mr. McAuley will testify that the April 2nd letter indicated that the TLE/Flagstar relationship was

14   in a "pending" termination status, that Flagstar had the right to terminate the relationship, but

15   would not do so unless circumstances failed to improve. Among the reasons that Mr. McAuley

16   so testifies is the following:

17           a.      The April 2nd letter mentions as reasons to terminate the warehouse line losses

18   reported in 2007 and "high lock fallout." First, operating losses are not part of the criteria for

19   Flagstar's own determination as to whether to grant warehouse lines of credit. Net worth and

20   overall operations are what are considered. Almost every warehouse lender lost money during

21   2007, and it is thus, in Mr. McAuley's view, nonsensical to have a loss in 2007 be related to

22   whether warehouse lending facilities will be extended, particularly where the financial

23   statements of TLE continued to show more than sufficient net worth and operating revenue. In

24   fact for the fiscal year 2007, except for expenses that were paid in 2007 that were incurred in

25   2006, the actual 2007 operation was running at a profit.

26           b.      "High lock fallout" relates to a warehouse lender who tells Flagstar Bank that it is

27   going to sell it loans that the warehouse lender is going to fund. The bank, Flagstar or some

28   other, then locks in a rate and takes steps assuming that the loan will be bought by it. When the

                                                    -3-

Opposition to Motion in Limine No. 1

1    loan fails to materialize there is a "fallout." However, as Mr. McAuley will tell us, high lock

2    fallout is an issue that concerns Flagstar as a bank, not as a warehouse lender. The warehouse

3    lending hat of Flagstar is not concerned whether there is high or low fallout. Thus, to tie

4    warehouse lines of credit to lock fallout issues makes little sense. It suggests the April 2nd letter

5    is not specific to the warehouse line or at least not seriously targeted to it.

6              c.      Flagstar continued to provide warehouse lines of credit to TLE through

7    September 2008. Credit was in fact extended until the discovery of the McConville fraudulent

8    scheme.

9              d.      Flagstar, in fact, processed FHA loan certification applications on behalf of TLE

10   after April 2nd. Flagstar continued to designate employees of TLE as delegated underwriters for

11   Flagstar long after April 2nd into October. It acted in every way as if its business relationship

12   with TLE was going to be expanded – not contracted.

13             e.      All of this and more will be testified to by Mr. McAuley relative to the

14   significance and meaning of the April 2nd letter. In fact, the temporal relationship with the

15   ultimate termination of all funding coincides with the discovery of the McConville fraudulent

16   scheme. Mr. McAuley, as part of his expert investigation and analysis, sought to confirm what

17   all these other pieces of evidence, plus his knowledge of the industry, made clear. He sought that

18   confirmation by calling Mr. Lathrop, an individual with whom he dealt on numerous occasions

19   over the years.

20             f.      In his deposition on August 29, 2012, Mr. McAuley was asked:
                       Question:     What prompted you to call Joe Lathrop?
21
                       Answer:       Two things. One is I had heard Mr. Nazari's side of the
22                     story, and they were -- you know, he characterized the relationship one
                       way, and I also know -- I know Joe Lathrop very well. So from my
23                     perspective it's not like I'm calling a stranger. It's somebody who I've
                       worked with often both on a friendly competitor relationship and as a
24                     business relationship. So I wanted to be able to speak to him.

25   (McAuley deposition, page 59, lines 14-23.)

26             It is not as if the conversation with Mr. Lathrop was sprung on Mr. Lathrop. Mr.

27   McAuley called Mr. Lathrop and left a message. And Lathrop "returned my call." (Page 60,

28   line 23.) In the conversation Lathrop confirmed:

                                              -4-

Opposition to Motion in Limine No. 1

...he told me he felt bad about how it played out [the termination of TLE and Nazari], and he said the biggest issue that came up, the real dilemma was that it caused -- it was this inability, when the fraud was detected on some of those mortgages, to understand who was involved and who's not involved, and I'm sympathetic to that because I've been in that same situation myself as a warehouse lender. So it's difficult to have the information at the time.

He said he had a lot of confidence in him [Nazari]. He [Lathrop]was surprised to think that he [Nazari] would ever actually be involved in the fraud, but that for obvious -- for us as warehouse lenders, for obvious reasons, if the mortgage banker is involved in a fraud, there's really not much you can do, other than just suspend or terminate the line. And he told me he did know from the ongoing investigation that they had done and a lot of forensic work and things that eventually came out after that, that Allen was not involved in the fraud, and that's where he more felt bad about how the whole thing played out. And I again, just to clarify, "So you're comfortable with him on an ongoing basis his integrity and working with him in the future? You said you would be willing to provide him a line, is that still correct? Did I hear you right?" And he said, "Absolutely."

(McAuley deposition, page 62, line 23 through page 63, line 22.)

7.     Stewart Title's rebuttal expert, Mr. Schmidt also wanted to talk to Mr. Lathrop. However, counsel for Stewart Title told him not to do it. Mr. Schmidt testified:

| | |
|---|---|
| Question: | Did you know that McAuley made a call to Joe Lathrop? |
| Answer: | Yes. |
| Question: | Did you talk to the attorneys about you calling Joe Lathrop? |
| Answer: | It was discussed. |
| Question: | Why didn't you pick up the phone and call Lathrop? |
| Answer: | It was ... actually it was not suggested that I do it. |
| Question: | So you were dissuaded from doing it then? |
| Answer: | Yes ... |

(Schmidt deposition, page 71, lines 21 through page 72, line 16.)

A comprehensive review of the facts that support Mr. McAuley's expert opinion is important to understanding the context of Mr. McAuley's conversation with Mr. Lathrop, and how it was used by Mr. McAuley in formulating his opinion. As discussed in more detail below, there is nothing objectionable in Mr. McAuley's testimony regarding the Lathrop conversation or for any of Counter-Claimants' other experts to rely on it, and therefore, Stewart Title's motion must be denied.

## II.     ARGUMENT

Federal Rule of Evidence 703 specifically allows experts, in reaching their opinions, to rely on facts outside the record and not personally observed, but of the kind that experts in his or

-5-

Opposition to Motion in Limine No. 1

1    her field rely on in forming opinions. Fed. R. Evid. 703. Once the court determines that the

2    facts are of a type reasonably relied on in the particular field, the second question is whether the

3    probative value of the underlying data substantially outweighs its prejudicial effect. *Id.*

4         Stewart Title's objection to Mr. McAuley's testimony regarding his conversation with

5    Mr. Lathrop based on hearsay is not well taken and should be overruled. Rule 703 specifically

6    allows experts to render opinions, even if based on hearsay. *See Valley Forge Ins. Co. v. Zurich*

7    *Amer. Ins. Co.*, Case No. C 09-2007 SBA, 2012 U.S. Dist. LEXIS 8378 at *7 (N.D. Cal. 2012)

8    (objection to expert testimony based on hearsay "is without merit"); *accord Daubert v. Merrell*

9    *Dow Pharmaceuticals, Inc.* 509 U.S. 579, 595 (1993) (Rule 703 permits experts to render

10   opinions based on hearsay so long as the hearsay is of the type reasonably relied on by experts in

11   that field). Stewart Title would like to exclude Mr. McAuley's testimony with Mr. Lathrop

12   because the evidence is not favorable to their defense. However, that is not the standard for

13   considering whether the court may allow Mr. McAuley to rely on facts outside the record in

14   reaching his opinion.

15        First, Mr. McAuley's conversation with Mr. Lathrop is precisely the type of information

16   relied upon by experts in his field. Mr. McAuley's conversation with Mr. Lathrop is exactly the

17   type of information that experts in mortgage banking rely upon. Data in this industry is gathered

18   primarily by speaking with executives in order to evaluate the landscape of the mortgage

19   warehouse industry. Mr. McAuley routinely relies upon conversations with executives in his

20   work as a consultant in the Mortgage Banking industry and in his involvement with the Risk

21   Management Association's Warehouse Lenders Roundtable, which is a forum where mortgage

22   banking executives get together to discuss trends in warehouse lending. Mr. McAuley will tell

23   the Court that he frequently relies on speaking with executives in his area of expertise in order to

24   make recommendations or form conclusions.

25        Mr. McAuley is highly qualified in his area of expertise, and Stewart Title has not

26   challenged his credentials. Stewart Title does not and cannot question Mr. McAuley's expertise

27   in the field of mortgage banking. Mr. McAuley has more than 24 years of extensive experience

28   in mortgage warehouse lending as a relationship manager, credit approver and as a business line

-6-

Opposition to Motion in Limine No. 1

1   manager with large and small banks and with a wide range of target markets.  He has been active

2   and engaged in all aspects of relationship, credit and operational management, and has extensive

3   experience with warehouse line winddowns and workouts.  Mr. McAuley has substantial

4   experience managing warehouse lines and is very familiar with the type of information that is

5   considered when a warehouse line makes its evaluations of candidates for credit or a decision to

6   terminate a line.  Common sense dictates that the best way for Mr. McAuley to confirm his view

7   that the April 2nd letter was not a final decision to terminate TLE's warehouse line, was to

8   consult the individual who was in charge of the warehouse line at issue.

9           In addition, the fact that Stewart Title's rebuttal expert, Mr. Schmidt, desired to speak

10   with Mr. Lathrop regarding his conversation with Mr. McAuley supports the notion that this

11   evidence is of the type an expert in this field would rely.  Mr. Schmidt testified that he in fact

12   wanted to have a discussion with Mr. Lathrop in order to formulate his expert opinion, but his

13   counsel dissuaded him from doing so.  Stewart Title had every opportunity for its rebuttal expert

14   to explore this information and speak to Mr. Lathrop directly to validate this information in order

15   to consider Mr. Lathrop's views in his opinion, but Stewart Title convinced Mr. Schmidt not to

16   do so.  Mr. Schmidt obviously wanted to talk to Lathrop because he viewed it as being useful

17   information, why do something that would not be useful.  Further, Stewart Title's attorneys

18   specifically did not want Schmidt talking to Lathrop because they knew they would not like what

19   Schmidt heard.  Stewart Title had the opportunity, either by way of deposing Mr. Lathrop, or by

20   way of Mr. Schmidt talking to Mr. Lathrop, to support its argument about the effect of the April

21   2nd letter.  They chose not to do so even though their own expert, Mr. Schmidt, wanted to talk to

22   Mr. Lathrop.  Therefore, Stewart Title's objection that it will be prejudiced because it does not

23   have the opportunity to cross-examine Mr. Lathrop is highly suspect.  This action also implies

24   that Stewart Title was not interested in confirming what Mr. Lathrop told Mr. Nazari in 2008,

25   and what Mr. Lathrop told Mr. McAuley earlier this year, because it would not be helpful to its

26   defense.  That is a weak justification to exclude probative evidence.

27           Second, Stewart Title's argument that Mr. Lathrop's statements are somehow unreliable

28   also fails to provide a basis to exclude Mr. McAuley's testimony.  The conversation between Mr.

-7-

Opposition to Motion in Limine No. 1

1   McAuley and Mr. Lathrop has more than the usual indices of reliability and appropriateness for

2   an expert to use as part of his opinion.  First, the long-term business relationship between Mr.

3   Lathrop and Mr. McAuley increases the reliability of the comments because the individuals had

4   dealt with one another in multiple situations in the past.  Mr. Lathrop knew Mr. McAuley was a

5   knowledgeable and experienced equal.  Secondly, Mr. Lathrop did not need to return the call if

6   he did not want to discuss any of this information.  Or he could have returned the call and

7   suggested that he was not going to talk about the TLE/Flagstar relationship.  He did neither.  Mr.

8   Lathrop owes nothing to Nazari or TLE and the fact that he chose to return the call and talk

9   about the situation elevates it reliability.  Lastly, this argument does not provide a basis to

10  exclude the evidence, but goes towards the weight the evidence should carry.  As this is a bench

11  trial, the Court should have available to it all the competing evidence in order to make its ruling.

12          Third, Stewart Title's attempts to exclude Mr. McAuley's testimony regarding his

13  conversation with Mr. Lathrop on the ground that the testimony is more prejudicial than

14  probative because the evidence is contrary to other evidence fails to provide a valid basis for

15  exclusion.  Stewart Title cites to *Turner v. Burlington Northern Santa Fe Railroad Company*,

16  338 F.3d 1058 (9th Cir. 2003), to support its position.  However, *Turner* is easily distinguished.

17  In *Turner*, the hearsay evidence (a lab report) was the only evidence an expert had in order to

18  formulate his opinion, and the expert used the report not as data upon which an expert in his field

19  would reasonably rely, but rather intended to use it as substantive evidence of his ultimate

20  conclusions.  Id. at 1062.  As discussed above, Mr. McAuley's conversation with Mr. Lathrop is

21  not the *only* evidence Mr. McAuley had available to him in order to formulate his opinion.  To

22  the contrary, Mr. McAuley will testify that he called Mr. Lathrop in order to *confirm* the

23  opinions he had formed regarding TLE only after he had conversations with Mr. Nazari, and

24  after a review of documents regarding TLE.  Notably, Mr. McAuley's opinion is also grounded

25  in his many years of expertise in mortgage banking and warehouse lending.  Unlike the expert in

26  *Turner*, here McAuley sought to confirm his opinion by way of an out of court statement; he is

27  not basing his opinion solely on his conversation with Mr. Lathrop.  *See United States v. Seale*,

28  600 F.3d 473, 492 (5th Cir. 2010) (court did not abuse discretion to allow testimony of expert

-8-

1    under *Daubert* where 1) expert's testimony made clear that he did not solely rely on another

2    witness, 2) experts are permitted a wide latitude of choosing what data they rely on in forming

3    their opinions, and 3) defendant was given every opportunity to challenge expert's opinion).

4         More significantly, *Turner* involved a jury trial. The second prong of Federal Rule of

5    Evidence 703 ("Rule 703"), which refers to whether the data is more probative than prejudicial,

6    relates to jury trials and does not apply to bench trials: Rule 703 states, "Facts or data that are

7    otherwise inadmissible shall not be disclosed **to the jury** by the proponent of the opinion or

8    inference unless the court determines that their probative value **in assisting the jury** to evaluate

9    the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703;

10   *Williams v. Illinois*, ___U.S. ____, 132 S. Ct. 2221, 2234-2235 (2012) (" In bench trials . . . the

11   Federal Rules places no restriction on the revelation of such information to the factfinder.").

12        At most, Stewart Title's arguments should be directed to the weight that the disputed

13   evidence carries, rather than an attempt to exclude it completely. Indeed, the proper challenge to

14   the accuracy of an expert's testimony is "not exclusion of the testimony, but rather, refutation of

15   it by cross-examination and by the testimony of its own expert witnesses." *Humetrix, Inc. v.

16   Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001); *see also Valley Forge*, 2012 U.S. Dist.

17   LEXIS 8378 at *8. There is ample evidence that Flagstar did not terminate its relationship with

18   TLE as contemplated in the April 2nd letter. The overwhelming evidence suggests that the

19   business relationship was expanding until TLE was accused of funding loans that were a part of

20   the McConville fraud scheme, which only occurred with the aid of Stewart Title's Branch

21   Manager. Any introduction of evidence related to Mr. McAuley's expert opinion without the

22   admission of evidence he relied on to formulate his opinion goes to the weight of the evidence,

23   and none of Stewart Title's arguments support its motion to exclude it in its entirety. *See Menghi

24   v. Hart*, 745 F. Supp. 2d 89, 102 (E.D.N.Y. 2010).

25        Additionally, Mr. Lathrop's statements to Mr. McAuley should not be excluded because

26   they either qualify as an exception to the hearsay rule or are being offered for reasons other than

27   to prove the truth of the matter asserted. First, Mr. Lathrop's statements will be offered to show

28   Mr. Lathrop's state of mind as it existed in 2008 when TLE's warehouse line was terminated.

-9-

Opposition to Motion in Limine No. 1

1    *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 694-95 (7th Cir. 2011) (loan officer's

2    statement regarding approval of home-equity loan was not an assertion of a factual matter but a

3    statement describing the bank's collective intentions and did not constitute hearsay, and in any

4    event, exception to hearsay rule for then-existing state of mind would have also applied); *see*

5    *also* Fed. R. Evid. 803(3).  Second, Mr. Lathrop's statements regarding Mr. Nazari's reputation

6    qualifies as an exception under Federal Rule of Evidence 803(21).  Mr. Nazari and TLE's

7    reputation is at issue in regards to TLE's ability to obtain a warehouse line.  Further, Mr.

8    Lathrop's statements are not hearsay when offered to show that in 2008, Mr. Nazari was told by

9    Mr. Lathrop that TLE's warehouse line of credit was terminated because of suspicion of fraud,

10    which was a material fact that had to be disclosed when TLE sought a new warehouse line, and

11    directly impacted TLE's ability to stay in business.  Therefore, the details regarding Mr.

12    McAuley's conversation with Mr. Lathrop should not be excluded.

13    **III.   CONCLUSION**

14         Mr. McAuley's conversation with Mr. Lathrop is the type of evidence that an expert in

15    the field of mortgage warehouse banking ordinarily relies.  The fact that the conversation with

16    Mr. Lathrop was something upon which an expert can and should rely is confirmed by the

17    testimony of the defendant's own expert, Ronald Schmidt.  Mr. McAuley's expert opinion is

18    imperative to understanding the mortgage warehouse lending landscape during 2008, there is no

19    real reason to question the accuracy or truthfulness of Mr. Lathrop's statements, and there is a

20    wealth of additional evidence for Mr. McAuley to rely on in forming his opinion in addition to

21    his conversation with Mr. Lathrop.  Mr. McAuley will offer testimony regarding his conversation

22    with Mr. Lathrop as an item which supports his opinions regarding TLE.  As such, Mr.

23    McAuley's testimony should not be excluded, and other experts testifying on behalf of Counter-

24    Claimants' should also be able to rely on it.  Stewart Title's motion in limine must be denied.

    DATED:  SEPTEMBER 24, 2012       MORGAN, FRANICH, FREDKIN & MARSH

25

26                 BY: _____

27                    FREEDA Y. LUGO
                   ATTORNEYS FOR CROSS-CLAIMANTS THE

28                    LOAN EXPERTS CORPORATION AND
                   HORMOZ NAZARI

Opposition to Motion in Limine No. 1