MARK B. FREDKIN, ESQ. (SBN 53550)
DAVID A. KAYS, ESQ. (SBN 120798)
FREEDA Y. LUGO, ESQ. (SBN 244913)
MORGAN, FRANICH, FREDKIN & MARSH
99 Almaden Boulevard, Suite 1000
San Jose, California  95113-1613
Telephone: (408) 288-8288
Facsimile:  (408) 288-8325

Attorneys for Cross-Claimants
HORMOZ NAZARI and THE LOAN EXPERTS
CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLAGSTAR BANK, FSB a Federally Chartered Savings Bank, <br><br> Plaintiff, <br><br> vs. <br><br> THE LOAN EXPERTS CORPORATION, d/b/a ALL AMERICAN FINANCE, a California Corporation, HORMOZ NAZARI, an individual, ELIZABETH CORTEZ PADILLA, an individual, 1350 ESCONDIDO COASTAL, LLC, a California limited liability company, WESTLAKE COASTAL, LLC, a California limited liability company, VCH-SALINAS 1, LLC, a California limited liability company, ALLSTAR APPRAISALS, INC., a California Corporation, JAMES MAY, an individual, STEWART TITLE OF CALIFORNIA, a California corporation, <br><br> Defendants. | Case No. 10-cv-03190-CRB <br><br> **CROSS-CLAIMANTS HORMOZ NAZARI AND THE LOAN EXPERTS CORPORATION'S TRIAL BRIEF** <br><br> Trial Date:    October 15, 2012 <br> Courtroom:    6 <br> Judge:    Hon. Charles R. Breyer <br><br> Complaint Filed:  Michigan 1/26/2010 <br> USDC/SF 7/21/2010 |
| AND RELATED CROSS-ACTION. | |

# **TABLE OF CONTENTS**

**PAGE**

I. PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II. STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The Parties . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.  Cross-Claimants The Loan Experts Corporation dba All American
            Finance and Allen Nazari. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.  Cross-Defendant Stewart Title of California, Inc. . . . . . . . . . . . . 2

    B.  Cross-Claimants' Relationship with Flagstar Bank, FSB. . . . . . . . . . . . 3

    C.  Demello's Participation in the Fraudulent Loan Scheme. . . . . . . . . . . . 3

    D.  Demello's Guilty Plea and Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. LEGAL ANALYSIS AND ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.      Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..  . . . . .  6

        1.      Stewart Title's Fraud Caused the Loan Experts' Damages . . . 7

        2.     Stewart Title is Responsible Under Respondeat Superior
             For Demello's Breach of Fiduciary Duties and Fraud . . . . . . . 10

        3.     Stewart Title's Defense of TLE's Negligence Barring TLE's
             Recovery is Legally and Factually Unsupportable . . . . . . . . . . 11

        4.     The Loan Experts' Damages. . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.      Punitive Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.      Indemnity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

**CASE**                                                                                                **PAGE**

*Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902 (9th Cir. 2008). . . . . . . . . .. . . . . 7

*Common Wealth Ins. Sys., Inc. v. Kersten*, 40 Cal. App. 3d 1014 (1974). . . . . . . . . . . 10

*Curry v. Fred Olsen Lines*, 367 F.2d 921 (1966) . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . .12

*Dawson v. Entek Int'l*, 630 F.3d 928 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Grewal v. Choudhury*, No. C 07-04218 CRB, 2008 U.S. Dist. LEXIS
   54731  (N.D. Cal. 2008).. . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Hannon v. W. Title Ins. Co.*, 211 Cal. App. 3d 1122 (1989) . . .. . . . . . . . . . . . . . . . 10

*Howell v. Courtesy Chevrolet,* 16 Cal. App. 3d 391(1971) . . . . . . . . . . . . . . . . . . . . 12

*Inter Mountain Mortg. Inc. v. Sulimen*, 78 Cal. App. 4th 1434 (2000) . . . . . . . . . . . . . 11

*John Y. v. Chaparral Treatment Cntr. Inc.*, 101 Cal. App. 4th 565 (2002). . . . . . . . . 10, 11

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291 (1995)  . . . . . . . . . . 10, 11

*Saks v. Charity Mission Baptist Church*, 90 Cal. App. 4th 1116 (2001) . . . . . . . . . . . 10

*Security-First Nat'l Bank v. Earp*, 19 Cal. 2d 774 (1942) . . . . . . . . . . . . . . . . . . . . . . .  12

*White v. Ultramar, Inc.*, 21 Cal. 4th 563 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wilson, McCall & Daoro v. Amer. Qualified Plans, Inc.*, 70 Cal.App. 4th 1030 (1999). .17


**CALIFORNIA STATUTES**

California Civil Code section 3294  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

California Code of Civil Procedure section 1021.6  . . . . . . . . . . . . . . . . . . . . . . . . . 17

## I.   PRELIMINARY STATEMENT

Cross-Claimants The Loan Experts Corporation, dba All American Finance ("TLE," or "The Loan Experts") was in business for almost twenty years at the time it was victimized by a fraudulent scheme involving Donna Demello, a former employee,  Escrow Officer, and Branch Manager for Cross-Defendant Stewart Title of California, Inc. ("Stewart Title").  The scheme was organized by a man named James "Jim" McConville ("McConville"), who used the names and credit scores of "straw" borrowers in order to secure funds to purchase real estate that the buyer never intended to own or occupy. Demello is currently serving a sentence in federal prison after pleading guilty to mail fraud as a result of her participation in the fraudulent scheme.  Demello's participation involved her and a co-associate at Stewart Title, Gigi Bautista, hiding from mortgage bankers the fact that the down payment for these fraudulent purchases was not coming from the buyer, which was information the mortgage bankers all demanded, and further that the net proceeds from the sale, after the loan, in fact went to McConville or one of his entities, not the seller.  Both the information as to who made the down payments and the data as to third parties receiving any money out of escrow were information that was demanded by all mortgage lenders, including TLE.  Demello herself has agreed that the loans that were made by TLE would not have been made had she conveyed the true information on the McConville transactions.  Thus, Stewart Title's duplicity in the fraud was necessary in order for it to succeed.

The original Plaintiff in this action, Flagstar Bank, FSB ("Flagstar"), sued the parties in this Cross-Claim, among many others, for losses they incurred due to the mortgage scheme that became the subject of federal criminal indictments in this District.  Initially, Flagstar suspected The Loan Experts as being part of the fraudulent scheme.  Flagstar, thus, terminated its relationships with The Loan Experts and published its troubles involving TLE, which made it impossible for TLE to obtain credit to continue its business.

The result was that The Loan Experts, in business for almost 20 years, closed. Its subsequent lost profit exceeds $4 million.  And to add insult to injury, Flagstar sued TLE and Nazari, requiring them to incur $98,252 in defense costs for a case created by Stewart Title's fraud.  These monies too are requested to be compensated.

## II.    STATEMENT OF THE CASE

### A.  The Parties

#### 1.  Cross-Claimants The Loan Experts Corporation dba All American Finance and Allen Nazari

Cross-Claimant The Loan Experts is a mortgage banking company owned by Cross-Claimant Nazari.  TLE acted as the first lender with respect to the mortgage loans at issue, and based on a correspondent relationship, described more fully below, sold those loans to Flagstar Bank.  Nazari was the principal of TLE during the relevant time period.  During its time in business, TLE placed more than a Billion dollars worth of loans.  Prior to being victimized by the McConville scheme, not one default occurred on any of those loans.  During its relationship with Flagstar, TLE placed close to $100 Million in loans with Flagstar.  While relatively small in volume in comparison to all of the other business TLE had done over the years, the fraudulent loans at issue in this case succeeded in ruining TLE's business.

#### 2.  Cross-Defendant Stewart Title of California, Inc.

Cross-Defendant Stewart Title performed the escrow and closing functions for the eleven transactions at issue in this case (the "Subject Loans").  Stewart Title undertook obligations which included, without limitation, (a) an obligation to comply with all written escrow instructions submitted by The Loan Experts; (b) an obligation to disclose any and all relevant information concerning the transactions in accordance with its fiduciary obligations; and (c) the obligation to accurately represent information concerning the nature of the transaction on the settlement statement.  Demello was Stewart Title's employee and the Escrow Officer for these transactions.  She was also a Branch Manager.

Demello plead guilty in federal court for the fraud associated with the transactions at issue in this case.

### B.  Cross-Claimants' Relationship with Flagstar Bank, FSB

Flagstar began doing business with Nazari and TLE in 2001, when Flagstar, Nazari and TLE entered into the "Correspondent Purchase Agreement" pursuant to which TLE would prepare and submit prospective mortgage applications to Flagstar for funding.

TLE also entered into a "Mortgage Warehousing and Security Agreement" (the "Warehouse Agreement") where Flagstar would advance funds to The Loan Experts to loan money for mortgages that would eventually be sold primarily, but not necessarily exclusively, to Flagstar.  The Warehouse Agreement relevant here was signed in May 2006.

### C.  Demello's Participation in the Fraudulent Loan Scheme

Stewart Title's Branch Manager at its Campbell office, Demello ("Demello"), participated in a massive real estate fraud that cost mortgage bankers, including Cross-Complainant The Loan Experts, millions of dollars. Demello, Stewart Title's employee/agent, plead guilty for her participation in the fraud and has been sentenced to Federal Prison for her part in the fraudulent scheme and was ordered to pay restitution of $7,436,417.83 to other lenders who were defrauded by this scheme.  That scheme went like this:

1.      Identify condominium properties for sale, all of which were in Southern California.

2.      Pay a real estate appraiser to overstate the value of the condo project and the particular condominiums for sale;

3.      Pay individuals to allow the scheme organizer, Jim McConville, to use their name and credit as purported bone fide purchasers, when in fact the "straw individual" buyers had nothing to do with purchasing the property;

4.      Pay the down payments for the "straw buyers;"

5.   Conspire with an escrow company employee, in this case Demello, to hide the fact that third party money came in and went out of the escrows established to consummate the sale, thereby hiding the fact that the "straw buyers" were just that, straw buyers, and that third parties were getting profit/kickbacks, and the sellers were not receiving the money as stated on documents submitted to the lenders.

6.   Close escrow, pay off the seller and keep the hundreds of thousands of dollars of funding over the real value of the property with no intent to pay the mortgage. Over $7.4 Million was stolen in this way.

The Loan Experts was one of the unfortunate, legitimate companies that were taken in by the fraud. It loaned on eleven of these fraudulent sales (the "Subject Loans"). The Loan Experts had been in business almost two decades. It had done hundreds of millions of dollars of mortgage banking. It funded residential loans through its own lending facility, its Warehouse Line of Credit. The Loan Experts would take funds from its warehouse lender, Flagstar Bank, and fund its approved mortgages. After the loan was made the loan then would be sold and The Loan Experts' Warehouse Line of Credit was repaid.

Often Flagstar Bank, wearing a different lending hat, would actually buy the loan pursuant to the correspondent relationship with TLE and its own Warehouse Line of Credit would be paid by its loan purchase. In mid-2008, the fraudulent McConville scheme was uncovered. Eighty-one loans were run through Stewart Title in the scheme orchestrated by McConville. Only eleven of these loans were funded by TLE.

When Flagstar Bank became aware of the fraud it did several things. Those were:

1.   It cancelled the TLE warehouse line of credit and its Correspondent relationship with TLE.

2.   It sued TLE, suggesting TLE was part of the fraudulent scheme, which was blatantly untrue. TLE was eventually dismissed from the suit, but not until after TLE spent almost three years defending against the lawsuit, over $98,000 in attorneys' fees

were expended.

3.  Flagstar placed TLE on a list of questionable organizations to which other lenders had access, based on its claim that TLE was part of the McConville fraud.

This sequence of events caused the failure of the 19-year business of The Loan Experts.  TLE had done hundreds of millions of dollars in loans over the years.  In 2005 alone it had done $290 million.  It had weathered the worst of the real estate "bubble" downturn from 2006 through mid-2008.  The mortgage brokering market was just starting to accelerate in mid-2008 when TLE was forced out of business.

The discovery of the fraud and Flagstar's reaction to it caused the failure of TLE in two ways.  First, it caused Flagstar to cancel the TLE warehouse line of credit, thus denying The Loan Experts the funds it needed to transact its mortgage loan business.  Second, and even more fundamentally, the business of The Loan Experts was condemned to death because while The Loan Experts could have replaced Flagstar Bank as its warehouse lender if there was no fraud claims, because there were other warehouse lenders available, TLE could get no other lender funding because The Loan Experts was stigmatized by being ensnared in the fraudulent transactions of which it had no knowledge and in which it did not participate.  Guilt by association, particularly in the economic times of 2008, condemned The Loan Experts to failure.  It lost over $4 Million in lost net profit from 2008 through 2013.  Nazari incurred in excess of $98,000 in defense costs to defend the legal action against it by Flagstar that flowed from the fraud.

### D. Demello's Guilty Plea and Judgment

On August 27, 2010, Demello plead guilty to a federal felony charge of conspiracy to commit mail fraud.  In pleading guilty, Demello admitted that as Stewart Title's escrow officer, she concealed from the lenders like The Loan Experts the "marketing fees" paid to McConville by creating two "final" settlement statements – one correct and one false – on the settlement form approved by the United States Department of Housing and Urban Development (called the HUD-1).  The correct version of the HUD-

1 that was provided to the seller would show a large marketing fee paid to an individual or entity associated with McConville.  The false version of the HUD-1 such as was sent to The Loan Experts did not show the payment of any marketing fee.  Demello would then pay the "marketing fee" by cutting numerous checks directly from the escrow account to various individuals associated with McConville and/or to corporate entities he controlled. Demello acted in this manner with respect to all of the Subject Loans at issue here, in addition to 81 other loans associated with the fraud scheme.  Stewart Title, which profited from the fees generated by these transactions, breached the standard of care in the escrow industry through mismanagement of its escrow officers and by failing to detect, prevent, or stop the cascade of fraudulent loans.

### III.    LEGAL ANALYSIS AND ARGUMENT

#### A. Fraud

Through the actions of its employee, Donna Demello, Stewart Title is liable to TLE for fraud.  California recognizes five elements of common law fraud: "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage. *See, e.g., Grewal v. Choudhury*, No. C 07-04218 CRB, 2008 U.S. Dist. LEXIS 54731 at *9 (N.D. Cal. 2008).

Here, Stewart Title made several misrepresentations to The Loan Experts, who was the lender on these Subject Loans.  Those misrepresentations include falsifying estimated settlement statements which were relied upon by TLE in determining whether or not to approve the loan applications for funding, and falsifying Final HUD-1 statements to conceal from TLE that marketing fees were being paid to McConville, rather than to the seller of the property.

As an Escrow Officer, Demello was familiar with the importance of truthful disclosures required by The Loan Experts.  Indeed, the purpose of involving an Escrow company in closing a real estate transaction is to have a third party ensure that the closing

instructions are properly followed prior to closing of escrow and disbursement of funds. More importantly, Demello was aware during the escrow process for all of the Subject Loans that TLE depended on the honesty and thoroughness of Stewart Title, as mandated by the Closing Instructions. Demello was also aware that the lenders would not have funded the Subject Loans if they were aware that the borrowers were actually "straw buyers" and that the majority of the proceeds from the transaction were being returned to McConville or McConville controlled entities and not the seller of the properties. Demello knew the falsity of her representations to TLE and that the closing requirements for the Subject Loans had not been met prior to disbursement.

Indeed, Demello made the misrepresentations to TLE with the intent to induce The Loan Experts to fund the Subject Loans. She knew The Loan Experts would never have loaned the funds or sold the loans to Flagstar (or any other bank) had TLE known about the misrepresentations. Demello has acknowledged this in her testimony in this action. There is no question that TLE justifiably relied on Demello and Stewart Title as the Escrow company for the Subject Loans.

## 1. Stewart Title's Fraud Caused The Loan Experts' Damages

As a proximate result of Stewart Title's misrepresentations, TLE and its owner Allen Nazari have been damaged. Those damages include the loss of net profits from 2008 to 2013 which TLE should have enjoyed. They also include damages to Nazari and TLE in defending against the Flagstar lawsuit.

Stewart Title claims that The Loan Experts cannot prevail because it cannot show that the fraud it committed proximately caused damage to Cross-Complainants. California uses the "substantial factor test" for determining causation in intentional tort cases: "Although a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor, the substantial factor test is a broader rule of causality than the 'but for' test." *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008). In addition, causation can be proven circumstantially by the temporal

proximity between the act and consequence thereof.  *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011).

Here, the "fall out" from funding loans tainted with fraud by Stewart Title is obvious.  The evidence shows that Stewart Title's fraud was a substantial factor in not only causing TLE to lose its credit with Flagstar, but to be put out of business.  Because Flagstar suspected The Loan Experts was part of the fraud, Flagstar cancelled all of its business relationships with The Loan Experts, including the correspondent purchase relationship and the warehouse line of credit.  Stewart Title argues that because Flagstar sent letters to The Loan Experts in April 2008 regarding a prospective termination of the warehouse line due to The Loan Experts' losses in 2007 and high lock fallout, Flagstar's decision to terminate TLE's warehouse line of credit had already been made prior to the origination of the Subject Loans.  Therefore, Stewart Title argues, Flagstar had already decided to terminate TLE's warehouse line prior to the discovery of the fraudulent transactions, and the losses suffered by TLE could not have been caused by Stewart Title. This argument fails for a number of reasons.

First, TLE's warehouse line of credit was not cancelled prior to the time that the fraudulent loans were originated and discovered.   Although Flagstar had sent correspondence to TLE notifying it of an impending termination, Flagstar did not actually terminate the warehouse line of credit until after the investigation into the fraudulent transactions had already commenced and after it suspected that TLE participated in the fraud.  This is evidenced by letters from Flagstar extending the date of termination of the line, as well as the fact that Flagstar continued to fund loans into September, obviously after August 1, 2008, the date that Stewart Title claims was the last date that Flagstar agreed to extend the warehouse line based on Flagstar's correspondence.   TLE will present expert testimony from Michael McAuley, an expert in the warehouse lending industry, demonstrating that banks often send prospective termination letters for warehouse lines without actually intending to terminate the line.  Further, Mr. McAuley

will also testify that the ultimate reason that Flagstar terminated the warehouse line of credit was because of accusations of fraud, and not because of the reasons previously stated in Flagstar correspondence.  He arrived at that conclusion based on his experience in the mortgage warehouse industry, after a review of documents, and by speaking directly with Mr. Joe Lathrop, the head of the Warehouse Lending division of Flagstar at the time TLE's warehouse line was terminated to confirm his views.

Second, even if Flagstar had already made the decision to terminate The Loan Experts' warehouse line prior to the origination of the fraudulent loans, The Loan Experts could have applied for and received warehouse funding from alternative sources, had it not been entrapped by the McConville fiasco.  Once TLE was accused of participating in the fraudulent scheme, there was no possible way for it to obtain another warehouse line of credit from *any* institution.  This is because TLE would have to disclose the reasons for the termination of its line with Flagstar, and any warehouse lending institution would automatically deny an application for a warehouse line of credit based on Flagstar's termination due to allegations of fraud.  Mr. Nazari was aware that Flagstar suspected TLE of fraud and terminated its relationships for that reason.  Mr. Nazari was told directly by Mr. Lathrop, the Vice President of the Warehouse Lending Division of Flagstar that the line was terminated due to misrepresentation.  Nazari had to disclose that information in any application for a new warehouse line from any other potential financial institutions. Flagstar published the fact that TLE had allegedly misrepresented loan information.

Stewart Title's fraud caused Flagstar to suspect that TLE was involved with the fraudulent scheme.  Without Stewart Title's fraud, The Loan Experts could have continued its business as a mortgage banking institution.  However, once TLE was accused of participating in fraud and funding fraudulent loans, it lost its warehouse line and correspondent relationship with Flagstar, and it also lost any ability to obtain a warehouse line elsewhere.  Stewart Title cannot escape that the fraud it committed was a substantial factor in causing TLE's damages.

## 2. Stewart Title is Responsible Under Respondent Superior for Demello's Breach of her Fiduciary Duties and Fraud

This is a clear case of liability.  Demello, Stewart Title's employee, plead guilty and received a judgment for her involvement in the McConville fraud scheme.  She spelled out exactly what her role was in defrauding the lenders in this case in her guilty plea and during her deposition in this action.  As escrow holder for the Subject Loans, Stewart Title, through its employee Donna Demello, was "the limited agent and fiduciary of all parties to [the] escrow."  *See Hannon v. W. Title Ins. Co.*, 211 Cal. App. 3d 1122, 1127 (1989).  The Loan Experts was the original lender who was defrauded on these transactions.  The escrow agent has both a duty to strictly adhere to the closing instructions of the parties, as well as a duty to disclose material facts that would have a substantial adverse effect on a principal – particularly where the escrow holder knows that the principal is looking to her for protection as to those very facts.  *Hannon*, 211 Cal. App. 3d at 1127; *see also Common Wealth Ins. Sys., Inc. v. Kersten*, 40 Cal. App. 3d 1014, 1030-1031 (1974).  Demello testified that she understood that The Loan Experts would not fund on these transactions had she disclosed the fraud.

Stewart Title cannot escape liability in this case by arguing that it is not responsible for Demello's actions and the damages they caused.  Under the doctrine of *respondeat superior*, an employer is vicariously liable for his employee's torts committed within the scope of employment.  *See, e.g., John Y. v. Chaparral Treatment Cntr. Inc.*, 101 Cal. App. 4th 565, 574 (2002).  Even "an employee's willful, malicious and even criminal torts may fall within the scope of his or her employment for purposes of respondeat superior, even though the employer has not authorized the employee to commit crimes or intentional torts."  *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291 296-97 (1995); *see also Saks v. Charity Mission Baptist Church*, 90 Cal. App. 4th 1116, 1137 (2001) (The doctrine of respondeat superior may "provide a ground for imposition of liability on a fraud theory.").  Liability may be imposed even when the acts are "against the employer's

1  rules or policies conferred no benefit upon it." *John Y.*, 101 Cal. App. 4th at 575.

2      To establish liability under the doctrine of respondeat superior, there must be "a

3  nexus between the employee's tort and the employment[.]" *Inter Mountain Mortg. Inc. v.*

4  *Sulimen*, 78 Cal. App. 4th 1434, 1441 (2000).  The alleged tort must "be engendered by or

5  arise from the work[.]"  *Lisa M.*, 12 Cal. 4th at 298.  The risk that an employee will

6  commit such an intentional tort "must be predictably created by the employment." *John*

7  *Y.*, 101 Cal. App. 4th at 575.

8      Here, Donna Demello's position at Stewart Title was an Escrow Officer.  She was in

9  a position of trust and in charge of large amounts of money.  Her role was that of a

10  gatekeeper to assure that the escrow funds were disbursed correctly, meaning that they

11  would not be disbursed unless the closing instructions were satisfied.  The fraud that

12  Demello committed, falsifying documents and failing to disclose material facts, arose

13  directly from her employment as an Escrow Officer.  Stewart Title's role in these

14  transactions was specifically for the principals, including The Loan Experts, to depend

15  upon it by fulfilling the duties that it was hired to carry out as the escrow holder.

16  Mishandling of escrow funds and intentional misrepresentations of material facts related to

17  transactions is a predictable risk created by the position of an Escrow Officer.  There are

18  specific standards of auditing and safeguards in the escrow industry specifically targeted to

19  address these risks.  Because Stewart Title failed to meet those standards and failed to

20  detect, stop and address the Demello's fraud, Demello's fraud enabled a widespread

21  scheme, The Loan Experts was accused of involvement in that fraud and had to close its

22  doors after twenty years of business.  Through the doctrine of respondeat superior, Stewart

23  Title must be held liable for the fraudulent activities of its employee.

24              **3.    Stewart Title's Defense of TLE's Negligence Barring TLE's**

25                  **Recovery is Legally and Factually Unsupportable**

26      In classic defense tradition, Stewart Title suggests it was not their fraud, but TLE's

27  own negligence that should somehow protect Stewart Title from liability.  Of course, the

28

law is absolutely clear that a defense of contributory negligence does not apply to claims for intentional misrepresentation.  *See Howell v. Courtesy Chevrolet*, 16 Cal. App. 3d 391, 403 (1971); *see also Curry v. Fred Olsen Lines*, 367 F.2d 921, 928 (1966); *accord, Security-First Nat'l Bank v. Earp*, 19 Cal. 2d 774, 777 (1942).  The backhanded attempt to argue somehow that TLE's alleged negligence precludes liability for fraud is, thus, completely misplaced.  Stewart Title cannot assume its fraudulent conduct, meant to induce mortgage bankers to make loans, is somehow going to be prevented by the mortgage banker's own alleged loan processing failure.  Demello and, thus, Stewart Title, in fact assumed that if they misstated the information that the loans would be made.  The law does not give a "defrauder" an out if the party defrauded makes a negligent misstep itself.

Factually, of course, these arguments are preposterous. As the Court will see, Mike Fleming, a veteran of more than a quarter century of underwriting files, will point out the fact that TLE's underwriting practices and policies were not only within the standard of care, but were exemplary. The Court will judge for itself the views expressed by the defense expert on these topics.

What will not be subject to debate is the fact that there were 81 loans made by multiple financial institutions, none of which caught the same fraud visited upon TLE. Were seventy-one other financial institutions derelict as well?  Of course not.  Apparently everyone bears responsibility for these loan losses except Stewart Title whose fraud helped precipitate them.

As the Court will also see, Stewart Title's proffered expert in this area bases his views on factually incorrect assumptions, or on no facts at all.  For example, Stewart Title's expert, Mr. Jacobs, assumes that the appraisals that were gotten on these properties were ordered by someone other than The Loan Experts.  The court will hear evidence as to why this assumption is incorrect.  Not only did The Loan Experts follow all appropriate industry standards, but its underwriting was reviewed by Flagstar itself to make sure that

1    the requirements were all met.  In each case they were.  Thus the legally irrelevant defense

2    of comparative negligence is factually devoid of merit in any event.

3           **4.      The Loan Experts' Damages**

4           The Loan Experts had been in business for more than 19 years.  It had done volumes

5    of business, up to $290 million per year.  When the real estate bubble hit in 2006, TLE had

6    already taken steps in anticipation of the market being "overheated."   While its volume

7    was decreasing TLE was shedding overhead and moving its offices from a large

8    processing facility in Turlock, California, back to a small office in Saratoga, California.

9    TLE foresaw that conventional loans were where the majority of the residential loan

10   market would go for its financing.  To that end, TLE sought, through the aid of Flagstar

11   Bank, to obtain FHA certification.   While only roughly five percent of the home loans

12   were FHA loans through the first part of 2008, over the next 24 months and beyond the

13   number of FHA loans increased to twenty percent or more of the marketplace.   TLE

14   accurately foresaw that market shift and obtained FHA Eagle certification.  TLE also was

15   able to retain the most experienced and highest quality office employees.  Consequently, it

16   was anticipated, and in fact occurred, that they would be much more productive and

17   capable of doing higher volumes of loans with less staff and overhead.   Nazari also

18   determined that he would be the primary source of sales rather than relying on other sales

19   people which meant the payment of no commissions.  Nazari could keep the commission

20   expense totally in-house since he was a sole owner and payment of commissions was not

21   necessary.  Further, it was Nazari who had most of the significant business contacts with

22   individual loan brokers and/or real estate brokers who were the primary source of business

23   for TLE.  Nazari had also expanded his business license to cover other western states such

24   as Arizona, Nevada and Oregon.

25          Thus, in mid-2008, TLE had reworked itself and was poised in the marketplace to

26   take advantage of his contacts and market experience.  Instead of being able to enjoy that

27   market improvement over 2006 and 2007, TLE was put out of business.

28

Experts in the mortgage banking industry, Joe Garrett and Mike McAuley, whose business it has been to provide consultation and financial analysis to the mortgage banking industry, will provide important market data and opinions to the court.  Stewart Title has no expert to in any way refute or rebut the expertise and data provided by Mr. Garrett and Mr. McAuley.  Mr. Garrett, in particular, will provide his views as to what conservatively The Loan Experts could have enjoyed by way of dollar volume of mortgage loan production in the period 2008 through 2013.  His conclusions, backed by data based on industry specific statistics generated by The Mortgage Bankers Association of which Mr. Garrett is intimately familiar, points to volume in excess of $315 million that TLE could have generated from August 2008 through the end of 2013.  Taking that information, CPA Valuation Expert and often appointed business trustee, Randy Sugarman, has computed a conservative net profit loss on the mortgage banking volume reasonably expected.  That net dollar loss is approximately $4.1 million.  How the net profit was derived and the conservative basis upon which it was tested will show the Court that under the appropriate legal standards TLE has suffered compensable lost net profits in the amount stated.

In addition, Cross-Claimants suffered damages for attorneys' fees expended in defending the lawsuit brought by Flagstar.  The amount of attorneys' fees incurred in defense of that action is $98,252, not including interest.

## B. Punitive Damages

Cross-Claimants are also entitled to punitive damages as Stewart Title's actions were despicable, malicious, willful and fraudulent.  California Civil Code section 3294 provides that in an action "for breach of an obligation not arising from contract," a plaintiff may seek punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code §3294(a).  In order for an employer to be liable for punitive damages under the theory of respondeat superior, "the employer must have advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or

authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud or malice must be on the part of an officer, director, or managing agent of the corporation." Cal. Civ. Code §3294(b). A managing agent is an employee who "exercises substantial discretionary authority over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999).

Cross-Claimants are entitled to punitive damages in this case. Stewart Title's employee, Donna Demello plead guilty to her fraudulent activities, and was sentenced to federal prison for her role in the fraudulent loan scheme. Demello was a Branch Manager of one of Stewart Title's offices and supervised other employees. As such, Demello had considerable control over the operations of the branch she managed. She also played a role in the policy decisions of Stewart Title by taking part in business development discussions regarding whether to take the business from McConville. Stewart Title's corporate counsel did not want the McConville business as McConville was on a "watch" list. Demello and other executives still desired the business from the 80+ transactions and took them over Counsel's concerns. Because Demello satisfies the criteria of a managing agent, Stewart Title should be liable for punitive damages.

In addition, Demello's actions were ratified by other directors and managing agents at Stewart Title in a number of ways, exposing Stewart Title to liability for punitive damages. First, Demello testified that McConville approached her for Stewart Title to handle the escrow for the 81 loans associated with the McConville scheme. Supervisors were aware that McConville had a bad reputation, but Stewart Title decided to act as the Escrow Officer anyways because it was attracted by the potential income that these transactions would earn during the slow business they were experiencing due to the downturned economy. Second, the discovery of the fraudulent transactions occurred in late summer 2008. A review of the escrow files for the fraudulent loans was conducted in March 2009

by Amelia Seymour, an executive at Stewart Title, following an article in a San Diego newspaper regarding the straw buyer loan scheme. Seymour testified that she reviewed the files to see if there was anything out of the ordinary because Demello was quoted in the newspaper article. After a review of the 81 files, Seymour found **nothing** out of the ordinary. However, Cross-Claimants' retained expert on escrow transactions, Judi Souza, reviewed the escrow files for the eleven loans at issue in this Cross-Claim and found startling deviations from the standard of care in the escrow industry and numerous red flags that should have alerted Seymour that the transactions were fraudulent in every file. Even after Stewart Title was aware that these transactions were tainted by fraud, Seymour was not critical of any of the escrow files related to these loans. This indicates that Seymour, an executive and policymaker at Stewart Title, ratified Demello's fraud.

Notably, despite the newspaper article and review of files that should have alerted Stewart Title to the widespread fraud committed by Demello, Demello was not terminated until March 2010 (three months after the lawsuit was filed by Flagstar against Stewart Title and Cross-Claimants). Further, Gigi Bautista, Demello's Escrow Assistant, who was aware of and participated in the fraud, is still employed by Stewart Title.

Incredulously, after all of these events, Stewart Title kept the proceeds it collected from the fraudulent transactions. It now admits that its Escrow Officer was guilty of fraud. The Flagstar lawsuit was the consequence of Demello's fraud and Stewart Title's ratification of her fraud. Yet Stewart Title continues to deny liability and has never offered to compensate Cross-Claimants for their losses despite the demand presented in the Cross-Action. Therefore, Cross-Claimants should be awarded punitive damages.

**C. Indemnity**

Cross-Claimants were forced to defend themselves against the original action that was filed by Flagstar because of Stewart Title's fraud and negligence. In this case – Flagstar brought a lawsuit that sued Cross-Claimants for breaching the agreements that governed their relationship, negligence, negligent misrepresentation, unjust enrichment,

fraud, and conspiracy. The lawsuit stemmed from Flagstar's losses emanating from the fraud related to the Subject Loans. Had Stewart Title honestly and competently fulfilled its duties to The Loan Experts, The Loan Experts would not have funded the fraudulent loan applications, and The Loan Experts would never have been accused of or sued for the fraud associated with the Subject Loans. Through their misrepresentations and omissions, Stewart Title dragged The Loan Experts into this litigation, and forced The Loan Experts to defend itself against the allegations.

Cross-Claimants have suffered damage, namely, attorney's fees and litigation costs. Cross-Claimants assert two counts for indemnity: Declaratory Relief re: Comparative Indemnity (Count I) and  Declaratory Relief re: Equitable Indemnity (Count II). Nazari has incurred $98,252 in attorney's fees and costs for having to defend himself and TLE against Flagstar's suit. Cross-Claimants seek a judicial determination and a declaration of Stewart Title's liability for these damages and a declaration that Stewart Title indemnify the Loan Experts for the sums that Cross-Claimants were required to pay and for which Stewart Title was determined responsible.

Under California law, Cross-Claimants can seek attorney's fees as part of the claim for indemnity. Here, Cross-Claimants are seeking a determination that Stewart Title's conduct caused Cross-Claimants to be sued by Flagstar, which required attorney's fees and costs to be incurred and which entitles TLE to compensation. An innocent indemnitee that has incurred attorney fees to defend itself may recover fees under California Code of Civil Procedure section 1021.6 ("Section 1021.6") following a meritorious and successful indemnity claim. *See Wilson, McCall & Daoro v. Amer. Qualified Plans, Inc.*, 70 Cal. App. 4th 1030 (1999). In addition, a party is not precluded from recovering fees under Section 1021.6 because it never paid towards a judgment or settlement in the litigation. *Id.* at 1037. Here, Flagstar dismissed Cross-Claimants with prejudice, without requiring a payment of any sum whatsoever. A determination of the rights and obligations between the Cross-Claimants and Stewart Title on Flagstar's complaint in this Cross-Complaint is

both appropriate and necessary for Cross-Claimants to recover their damages, i.e. attorney's fees and costs.

**IV.   CONCLUSION**

For the reasons stated above, judgment should be awarded in favor of Cross-Claimants The Loan Experts Corporation and Nazari.

Dated: September 27, 2012              MORGAN, FRANICH, FREDKIN & MARSH

                                       By:  /S/
                                       MARK B. FREDKIN
                                       FREEDA Y. LUGO
                                       Attorneys for Cross-Claimants *Hormoz Nazari
                                       and The Loan Experts Corporation*