IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLAGSTAR BANK,<br><br>    Plaintiff,<br><br>    v.<br><br>LOAN EXPERTS, et al.,<br><br>    Defendants.<br>_____/ | No. C 10-03190 CRB<br><br>**ORDER GRANTING SUMMARY JUDGMENT** |

This case is about the fallout from a mortgage fraud. Flagstar Bank sued The Loan Experts and The Loan Experts's principal, Hotmoz Nazari, among others, alleging that the defendants had engaged in a fraud in connection with twenty-two residential mortgage loan transactions. See Notice of Removal Ex. 1 (dkt. 1) (Compl.) ¶ 2. The Loan Experts and Nazari filed a Cross-Claim against Stewart Title of California, the title company that served as the escrow agent on ten of the fraudulent loans. See generally Cross-Claim (dkt. 56); Seymour Decl. (dkt. 168) ¶¶ 7-8. Stewart Title now moves for summary judgment, arguing that (1) Flagstar's dismissal of its claims against The Loan Experts and Nazari establish that there is no genuine issue as to the Cross-Claim's two indemnity claims; and (2) the evidence demonstrates that the fraud did not cause The Loan Experts's and Nazari's harm, and so there are no genuine issues as to the Cross-Claim's fraud and negligent misrepresentation claims. See generally MSJ (dkt. 166). The Court agrees and therefore GRANTS the Motion,

as explained below.

## I. BACKGROUND

### A. The Relationship Between Flagstar and The Loan Experts

In 2008, The Loan Experts was engaged both in mortgage brokering (brokering a transaction to a lender to fund its loans) and in mortgage banking (using its own funds to fund its loans). See Johnson Decl. (dkt. 167) Ex. T (Nazari Depo) at 14:21-15:3. The Loan Experts established a relationship with Flagstar in 1994. Id. at 31:18-20. Initially, The Loan Experts was a broker approved by Flagstar to submit residential loans in which Flagstar Bank was the lender. Id. at 31:24-32:8. In 1996, The Loan Experts began a "correspondent relationship" with Flagstar, in which Flagstar agreed to let The Loan Experts fund loans, and Flagstar would buy them, so long as the loans were within Flagstar's guidelines. Id. at 33:10-18.

To do correspondent loan business with Flagstar, The Loan Experts needed a warehouse line of credit. Id. at 33:1-3. Flagstar provided that credit under a Mortgage Warehousing and Security Agreement and related warehousing notes. Id. at 38:24-39:25. Through those agreements, The Loan Experts obtained a $5,500,000 warehouse line of credit to be used to sell loans to Flagstar, and a separate line of credit. See Johnson Decl. Exs. H (Mortgage Warehousing and Security Agreement) and I (Warehousing Note). Often, "a loan that was funded by Flagstar's Warehouse Line of Credit would be paid off when [The Loan Experts] sold the loan to Flagstar who was buying the note for its own financial purposes." Nazari Decl. (dkt. 180) ¶ 6.

In order to maintain the separate warehouse lines of credit with Flagstar, The Loan Experts was required to submit annual audited financial statements and quarterly certified financial statements. See Johnson Decl. Ex. H section 7.10. The Warehousing Agreement was subject to termination by either party upon thirty days notice. Id. section 10.3.

//
//
//

**B.      Flagstar Documents About Terminating the Warehouse Line of Credit**

**1.      Content of the Documents**

In March of 2008, Flagstar completed an Interim Review and Increase request form relating to The Loan Experts. Johnson Decl. Ex. K. That form indicates that Flagstar's Credit Department and Loan Officer recommended denying The Loan Experts's warehouse line of credit based on The Loan Experts's 2007 losses and "their high lock fallout."[1] Id.

Other documents proffered by Stewart Title show that Flagstar then followed through with this recommendation to deny the warehouse line of credit, for the same reasons. See Johnson Decl. Exs. L, M, N, and O. For example, on April 2, 2008, Flagstar sent a letter to Nazari and The Loan Experts, stating that the warehouse line of credit had been denied "due to losses reported in 2008 and high lock fallout." Johnson Decl. Ex. L. The letter stated that funding requests would be honored until May 31, 2008 but not after that date. Id. An internal Flagstar email dated May 30, 2008 stated of The Loan Experts that "based on the significant loss in 2007 and their continued high lock fallout, we decided to not renew the warehouse line. We will give them an additional 30 days to wind down the line." Johnson Decl. Ex. M. The email stated that The Loan Experts's line would be closed July 1, 2008. Id. Another internal Flagstar email dated June 13, 2008 reflected that Flagstar was considering a further 30 day extension because "[t]hey are actively applying with other warehouse lenders but don't have anything in place yet" and because there were some closing documents still in The Loan Experts's name. Johnson Decl. Ex. N. A letter from Flagstar to Nazari and The Loan Experts dated June 16, 2008 stated, "Your warehouse line of credit in the amount of $5,500,000.00 has been extended with Flagstar Bank, FSB until August 1, 2008." Johnson Decl. Ex. O. No documents suggest that Flagstar extended the warehouse line of credit beyond August 1, 2008.

//

//

---

[1] According to Stewart Title, high lock fallout "refers to a situation in which an entity such as Loan Experts commits loans to Flagstar but then does not fund them." MSJ at 3-4.

3

### 2. Admissibility of the Documents

The Loan Experts argues that those documents (Johnson Declaration Exhibits L through O) are inadmissible hearsay. See Opp'n (dkt. 177) at 9. There is little question that they are out of court statements offered for the truth: that Flagstar closed the line of credit when it did, due to The Loan Experts's 2007 losses and high lock fallout. Stewart Title argues, though, that the documents are admissible as either business records or as reflections of Flagstar's state of mind. See Reply (dkt. 183) at 6-7.

The state of mind exception works, in part. First, it is not quite accurate to assert that Flagstar – a company made up of numerous people – had a state of mind. But the statements made by individuals at Flagstar can be evidence of those individuals' states of mind. Statements by those individuals that they planned to close The Loan Experts's line of credit are admissible as statements of intent. See Fed. Rule of Evid. 803(3) (defining state of mind as "motive, intent, or plan" as well as "mental feeling, pain, or bodily health"). However, statements by those individuals as to the reasons for closing the line of credit are inadmissible. See Wagner v. County of Maricopa, 673 F.3d 977, 987 (9th Cir. 2012) (finding that "statements . . . offered to show not only that [individual] was agitated . . . but also why he was agitated" were hearsay not permitted by Rule 803(3)); United States v. Emmert, 829 F.2d 805, 810 (9th Cir. 1987) (state of mind exception does not permit witness to relate statements as to why he had particular state of mind). Accordingly, the state of mind exception would allow into evidence the correspondence expressing an intention to close the line of credit on a particular date, but not the reasons for doing so.

The business record exception is a better fit. A document satisfies Federal Rule of Evidence 803(6)'s business records exception to the hearsay rule if "(A) the record was made at or near the time by . . . someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business . . . ; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

4

Stewart Title initially did not produce testimony of a custodian at Flagstar or other qualified witness that the documents were kept in the course of a regularly conducted activity.

However, the Court issued an order instructing Stewart Title to submit any evidence it had that the documents were business records. See Order re Johnson Declaration Exhibits L, M, N and O (dkt. 203). Stewart Title complied, submitting two declarations. The first is a declaration from counsel for Stewart Title, which attaches a stipulation between The Loan Experts and Flagstar that documents produced by Flagstar in response to discovery requests were authentic, met the foundational requirements of the business records exception to the hearsay rule, and could be sought to be admitted into evidence without the need for supporting witness testimony or a certification from a Flagstar custodian. See Picone Decl. (dkt. 205) Ex. Y. The second is a declaration by Flagstar Bank's records custodian, which states that the records produced by Flagstar, including exhibits L, M, N, and O of the Johnson Declaration, were related to the regular business activity of Flagstar, are true and accurate copies of those records that were kept in the ordinary course of business, were made at or near the time of the events to which they relate, by Flagstar employees who had knowledge of the contents, and that the making of the records was done in the ordinary course of Flagstar's business. See Kolp Decl. (dkt. 206) ¶¶ 7, 8. The Court is now satisfied that the business records exception applies, and allows Exhibits L, M, N and O to come into evidence in their entirety.

The Loan Experts also argues that the documents were improperly authenticated. See Opp'n at 9. The stipulation between The Loan Experts and Flagstar that documents produced by Flagstar in response to discovery requests were authentic, see Picone Decl. Ex. Y, undermines The Loan Experts's current position. Moreover, although unauthenticated documents cannot be considered in a motion for summary judgment, authentication can be accomplished when a document is produced in response to a discovery request. See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 972 (C.D. Cal. 2006). Here, Johnson Exhibit L and Exhibit O are written on Flagstar letterhead, were sent to Nazari, who does not deny receiving them, and were produced by Flagstar when it was a

5

party to this case. See Johnson Exs. L and O; Johnson Decl. ¶ 14 ("[t]he Flagstar production included the following documents"). Johnson Declaration Exhibits M and N include Flagstar electronic signatures and logo, do not appear to be untrustworthy, and were produced by Flagstar when it was a party to this case. See Johnson Exs. M and N; Johnson Decl. ¶ 14 ("[t]he Flagstar production included the following documents"). This is sufficient to authenticate the documents. See Maljack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996) (finding that documents were authenticated where party produced them in case, many of documents were on party's letterhead, and producing party did not contest authenticity).[2]

### C. The Fraud

In mid-July 2008, a loan made to borrower Marjorie Kraft closed. See Seymour Decl. (dkt. 168) ¶ 15. That loan triggered the first discovery of fraud. See Supp. Johnson Decl. Ex. V (Nazari Decl.) at 127:12-20, 200:2-20. The fraud worked as follows. The Branch Manager in Stewart Title's Campbell office, Donna Demello, "participated in a fraudulent scheme to defraud financial institutions by concealing material information related to mortgage loan applications." Fredkin Decl. Ex. B (Demello plea transcript) at 13:22-24. Demello was the escrow officer for the purchase of about 80 condominiums, purchased in the name of straw buyers who were promised to be paid between five and ten thousand dollars in exchange for allowing an individual named McConville to use their names and credit to obtain financing. Id. at 14:4-15. McConville then received large payments described as "marketing fees" (kickbacks) paid by the seller though escrow at the end of each transaction, which Demello fraudulently concealed from the lending institutions. Id. at 14:16-24. Demello pled guilty and was sentenced to prison for her role in the fraud. See generally id.; Fredkin Decl. Ex. C (judgment in a criminal case).

---

[2] In Maljack Productions, the document was being used against the producing party; here Flagstar is no longer a party and Stewart Title seeks to use them against The Loan Experts. Nonetheless, the Court has no reason to doubt that the documents here are what they purport to be, and Flagstar has not disputed their authenticity.

1    The Loan Experts discovered that it had written ten of the fraudulent loans.  Nazari
2 Decl. ¶¶ 7, 8.  The loans had been handled in the normal course, and Stewart Title, which had
3 handled the escrow on each of the ten loans, had provided the appropriate documentation.
4 Id.  The Loan Experts "had absolutely no idea that those loans were part of the fraudulent
5 scheme."  Id. ¶ 7.

6    The Loan Experts and Nazari contend that Flagstar both (1) terminated The Loan
7 Experts's line of credit as a result of the fraud, and (2) "placed The Loan Experts on a list of
8 questionable companies that was reviewed by others in the mortgage banking business" as a
9 result of the fraud.  Id. ¶ 10; Opp'n at 11-13.  Nazari closed The Loan Experts toward the end
10 of 2008.  See Supp. Johnson Decl. Ex. V at 182:23-25.

### D.    This Lawsuit

In January, 2010, Flagstar filed suit against The Loan Experts, Nazari, Stewart Title and others, seeking to recover damages it claimed it suffered due to twenty two non-performing "straw buyer" loans associated with McConville.  See generally Compl.  Flagstar alleged that it had acquired the subject loans in reliance upon various misrepresentations as to the identities of creditworthiness of the purported borrowers, the nature and terms of the underlying transactions, and the value of the subject properties.  Id. ¶¶ 19, 22.

In August 2010, The Loan Experts and Nazari filed a Cross-Claim against Stewart Title, arguing that if Flagstar "sustained damages as alleged in the complaint, these damages were caused, entirely or in part, by" Stewart Title.  See Cross-Claim ¶ 12.  The Loan Experts's theory is that it made loans in reliance upon Stewart Title's misrepresentations, and that, relying on those representations, it sold those loans to Flagstar, thereby causing Flagstar's injuries.  Id. ¶¶ 13-14.  The Cross-Claim includes causes of action for indemnity and for fraud and negligent misrepresentation.  Id. ¶¶ 10-47.

In November 2011, Stewart Title and Flagstar entered into a settlement through which Stewart Title paid Flagstar a sum of money and Flagstar released Stewart Title, The Loan Experts and Nazari from all claims.  See Johnson Decl. ¶¶ 11-12.  Neither The Loan Experts nor Nazari were required to pay anything as part of the settlement.  Id. ¶ 11; Nazari Decl. ¶

11 ("We paid no money because we did nothing wrong."); Johnson Decl. Ex. T at 186:19-24. Flagstar then dismissed The Loan Experts and Nazari with prejudice. Nazari Decl. ¶ 11; Johnson Decl. ¶ 12; Stipulation (dkt. 147).

Stewart Titles now moves for summary judgment on the Cross-Claim. See generally MSJ.

## II.  LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A principal purpose of the summary judgment procedure "is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Stewart Title moves for summary judgment on the two sets of claims in the Cross-Claim: the indemnity claims (Counts I and II) and the claims for fraud and negligent misrepresentation (Counts IV and V).[3] The Court will address each in turn.

### A.  The Indemnity Claims

The two indemnity claims seek to recover from Stewart Title "any sums that [The Loan Experts] may be compelled to pay as the result of any damages, judgment, or other awards recovered by [Flagstar] against [The Loan Experts]." Cross-Claim ¶¶ 15(b), 25(b). Stewart Title moves for summary judgment, arguing that "[t]here is no possibility that Loan Experts or Nazari will be compelled to pay anything to Flagstar as a result of Flagstar's

---

[3] Count III of the Cross-Claim, for Declaratory Relief re: Express Indemnity, is brought only against the Roe defendants. See Cross-Claim ¶¶ 28-38. Stewart Title assumes that The Loan Experts has dropped that claim, and The Loan Experts does not assert otherwise in its papers.

8

1  Complaint, nor is there any possibility that Flagstar will recover any judgment or other award
2  against Loan Experts and Nazari." MSJ at 14.

3        The Loan Experts does not dispute that, in light of the release and dismissal, it will not
4  have to pay anything to Flagstar. Instead, it argues that it is entitled to "any sums" it was
5  required to pay as a result of the fraud, which includes its attorneys' fees and costs. Nazari
6  asserts that he spent $48,115 in legal fees for former counsel, and over $25,000 in fees and
7  over $100 in costs by current counsel. Nazari Decl. ¶ 11. The Loan Experts offers two
8  reasons why it is entitled to its attorneys' fees, neither of which is compelling.

9        First, The Loan Experts points to language in the Cross-Claim as evidence that it has
10 always sought attorneys' fees. See Opp'n at 13 (citing Cross-Claim ¶¶ 16, 26-27). Although
11 there is some vague language in the Cross-Claim referring to "any sums that [The Loan
12 Experts] may be compelled to pay and for which [Stewart Title] is determined responsible,
13 entirely or in part," see Cross-Claim ¶¶ 16, 26, that vague language is sandwiched between
14 two far more specific clauses, which limit The Loan Experts's potential recovery to those
15 damages, judgment or awards recovered by Flagstar, see id. ¶¶ 15(b), 25(b) ("for any sums
16 that [The Loan Experts] may be compelled to pay as the result of any damages, judgment, or
17 other awards recovered by [Flagstar]" and id. ¶¶ 17, 27 ("for indemnification of sums that
18 [The Loan Experts] may be compelled to pay as a result of any damages, judgment, or other
19 awards recovered by [Flagstar] against [The Loan Experts]." Those more specific clauses
20 make clear that The Loan Experts did not seek to recover any sums it ever spent in
21 connection with the case, but only that money that Flagstar recovered from it. Further
22 support for that interpretation comes from the Cross-Claim's Prayer for Relief, which also
23 does not mention attorneys' fees. See Cross-Claim Prayer for Relief at 10 ("if [The Loan
24 Experts] are compelled to pay any sum as the result of any damages, judgment, or other
25 awards recovered by [Flagstar] against [The Loan Experts]"). The Cross-Claim therefore
26 does not entitle The Loan Experts to its attorneys' fees.

27       Second, The Loan Experts argues that "[a]n innocent indemnitee that has incurred
28 attorney fees to defend itself may recover fees under California Code of Civil Procedure

9

section 1021.6 . . . following a meritorious and successful indemnity claim." Opp'n at 13. The Loan Experts further argues that, in California, "a party is not precluded from recovering fees under Section 1021.6 because it never paid a judgment or settlement in the litigation. Opp'n at 13 (citing Wilson, McCall & Daoro v. Am. Qualified Plans, Inc., 70 Cal. App. 4th 1030, 1037 (1999)). This last argument is true, but insufficient.

The Loan Experts's problem with Section 1021.6 is not that it never paid a judgment to Flagstar (that is its problem with the language in the Cross-Claim); its problem is that it does not meet all of the requirements of Section 1021.6. That section provides:

> Upon motion, a court after reviewing the evidence in the principal case may award attorney's fees to a person who prevails on a claim for implied indemnity if the court finds (a) that the indemnitee through the tort of the indemnitor has been required to act in the protection of the indemnitee's interest by bringing an action against or defending an action by a third person and (b) if that indemnitor was properly notified of the demand to bring the action or provide the defense and did not avail itself of the opportunity to do so, and (c) that the trier of fact determined that the indemnitee was without fault in the principal case which is the basis for the action in indemnity or that the indemnitee had a final judgment entered in his or her favor granting a summary judgment, a nonsuit, or a directed verdict.

Cal. Civ. Proc. § 1021.6. Here, no trier of fact determined that The Loan Experts was without fault, and the Loan Experts had no final judgment entered in its favor granting summary judgment, a nonsuit, or a directed verdict. See id. Wilson, 70 Cal. App. 4th at 1036, upon which The Loan Experts relies, nonetheless held that a party must have "satisfied the requirements of section 1021.6." The Loan Experts has not done so.

Because neither the Cross-Claim nor Section 1021.6 permit The Loan Experts to recover its attorneys' fees in this case, there is no genuine issue of material fact on the indemnity claims, and the Court will enter judgment for Stewart Title on them.

### B.    The Fraud and Negligent Misrepresentation Claims

The fraud and negligent misrepresentation claims both allege that Stewart Title made misrepresentations to The Loan Experts, and that "[a]s a proximate cause of [Stewart Title's] misrepresentations, The Loan Experts [has] been damaged in an amount to be proven at trial." See Cross-Claim ¶¶ 42, 47. Stewart Title does not deny wrongdoing by its escrow officer, Demello, but takes aim only at The Loan Experts's proof of causation, arguing that

1  "Loan Experts cannot connect the wrongdoing to the damages it claims, which is the loss of
2  profits it asserts it would have received had it not gone out of business after Flagstar Bank
3  terminated its warehouse line of credit." MSJ at 10-11. Specifically, in an interrogatory
4  response, The Loan Experts stated that it "was put out of business as a result of its warehouse
5  line from Flagstar Bank being terminated and fraud allegations being made against it and its
6  principal, Mr. Nazari." Johnson Decl. Ex. D (Supp. Response to Interrog. No. 7) at 4.
7  Stewart Title argues that The Loan Experts cannot prove either basis for causation. MSJ at
8  11-13. The Loan Experts argues that there is a genuine dispute of fact about both. Opp'n at
9  8-13.

### 1. The Warehouse Line of Credit

In March 2008, Flagstar decided to deny The Loan Experts's warehouse line of credit. See Johnson Decl. Ex. K (Interim Review and Increase Request). Flagstar communicated that decision to The Loan Experts as early as April 2, 2008. Johnson Decl. Ex. L. The reason Flagstar gave for terminating the warehouse line was not fraud, but "losses reported in 2008 and high lock fallout." Id. In March and April of 2008, the fraud had not yet been discovered; the Kraft loan did not even close until July 18, 2008. See Seymour Decl. ¶ 15; Supp. Johnson Decl. Ex. V (Nazari Decl.) at 127:12-20, 200:2-20. Although Flagstar extended the termination date from May 31, 2008 to August 1, 2008, see Johnson Decl. Ex. O, there is no evidence that it was ever extended beyond August 1, 2008.

The Loan Experts nonetheless argues that the warehouse line of credit was cancelled after, and because of, discovery of the fraud.

It argues, first, that Flagstar continued to fund loans after August 1st. See Nazari Decl. ¶ 9; see also McAuley Decl. ¶ 9 ("Flagstar extended the warehouse line of credit through August 1, 2008 and continued to fund loans for The Loan Experts well after that date."). In fact there were apparently six loans that closed in August 2008 and one in September 2008. See Supp. Johnson Decl. Ex. U. But that six loans were funded does not create a genuine dispute of fact – in part because one of Flagstar's internal emails had indicated the advantage of allowing The Loan Experts to close the loans already in progress

11

(because otherwise the loans would need to be redrawn), see Johnson Decl. Ex. N, and The Loan Experts does not explain why Flagstar could not have continued to fund those loans and still close the warehouse line of credit. In addition, the existence of such loans does not undermine the evidence that Flagstar decided by March or April 2008 to terminate the line of credit, or the corresponding conclusion that that decision could not have been motivated by the fraud.

It next argues that R. Joe Lathrop, the former Vice President of the Warehouse Lending division of Flagstar, spoke with Nazari and an expert for The Loan Experts, Michael McAuley, and told them that The Loan Experts's warehouse line of credit would not have been permanently cancelled absent the fraud allegations. See Opp'n at 11-12; Nazari Decl. ¶ 9, McAuley Decl. ¶ 12. As even The Loan Experts acknowledges, however, Lathrop's statement is hearsay, see Opp'n at 12, and cannot be considered.

Finally, it also submitted a few documents in connection with Nazari's Supplemental Declaration, which at first glance could suggest that the warehouse line of credit might have continued beyond August 1, 2008 and been canceled due to the fraud. See Supp. Nazari Decl. Exs. 1-4. Exhibit 1 shows Flagstar approving one of The Loan Experts's employees as an underwriter in October 2008. See Supp. Nazari Decl. Ex. 1. Exhibit 3 is an internal Flagstar email from October 2008 stating that The Loan Experts would "be out [sic] into a pending termination status immediately," and Exhibit 4 is a letter canceling Flagstar's Wholesale Lending Agreement with The Loan Experts because "loan quality and delivery issues have made conducting business with The Loan Experts Corp. not in our best interest." Sup. Nazari Decl. Exs. 3, 4. But, upon closer review, Exhibit 1 pertains to The Loan Experts's continued status as a broker, not a mortgage banker; the warehouse line of credit was irrelevant to The Loan Experts's broker function. Similarly, Exhibits 3 and 4 relate to The Loan Experts as a broker and do not relate to the warehouse line of credit. Particularly concerning, Stewart Title submitted to the Court correspondence in which counsel for The Loan Experts stated that he had initially believed that Exhibit 4 was related to the cancellation of the warehouse line, but that he learned that it in fact related to the (unrelated)

12

1  Correspondent Purchase Agreement.  See Surrebuttal (dkt 200) at 4; Supp. Johnson Decl. Ex.
2  X.  That The Loan Experts went on to submit the document to the Court as evidence of the
3  closing of the warehouse line, see Supp. Nazari Decl. ¶ 4 ("This is the letter which best
4  reflects the date the lending agreement with Flagstar was in fact terminated.  The Loan
5  Experts warehouse line was officially terminated after I received this letter"), is misleading.[4]
6  There is therefore no genuine issue of fact as to whether the fraud caused Flagstar to
7  cancel the warehouse line of credit; it did not.

### 2. Stigmatizing Fraud Allegations

9  The Loan Experts's second basis for causation is that "[e]ven if Flagstar's Warehouse
10 Line had been terminated, there were other warehouse lenders who would have been
11 available to [The Loan Experts] but for [The Loan Experts]'s being stigmatized by having
12 made loans on real estate sales that turned out to be fraudulent."  Opp'n at 12.  But The Loan
13 Experts offers no admissible evidence that it was stigmatized.
14 The Loan Experts's best evidence of stigma is Nazari's assertion in his declaration
15 that Flagstar "placed us on a list of questionable companies that was reviewed by others in
16 the mortgage banking business."  Nazari Decl. ¶ 10.  Nazari, however, offers no foundation

---

[4] At the motion hearing, counsel for The Loan Experts made an altogether new argument as to the cancellation of the correspondent line.  Counsel asserted that its case was "not only about the warehouse line" but that the fraud also caused the correspondent line to be canceled, which impacted The Loan Experts's ability to get other credit.
   This assertion is problematic for several reasons.  First, The Loan Experts never relied on the cancellation of the correspondent line in its Opposition (or any) papers, and so opposing counsel never had an opportunity to respond.  Cf. United States v. Ward, No. 11-1067, 2012 WL 1252692, at *3 n.3 (C.D. Cal. Apr. 13, 2012) ("defense counsel failed to raise it in the motion papers, the government had no opportunity to respond in writing, and the Court therefore declines to consider it."); United States v. Rearden, 349 F.3d 608, 614 n.2 (9th Cir.2003) ("We decline to consider Rearden's argument ... because it is raised for the first time in reply.").  Second, The Loan Experts affirmatively represented in an interrogatory response that it "was put out of business as a result of its warehouse line from Flagstar Bank being terminated and fraud allegations being made against it and its principal, Mr. Nazari."  See Johnson Decl. Ex. D (Supp. Response to Interrog. No. 7) at 4; see also Nazari Depo at 198:3-16 (stating that it was "the loss of the warehouse line due to fraud allegations that caused [The Loan Experts] to go out of business").  That response did not mention the correspondent line.  Stewart Title was, and the Court is, entitled to take The Loan Experts at its word as to its theory of its case.  Cf. Judge William W. Schwarzer, et al., Federal Civil Procedure Before Trial 15:188 (The Rutter Group 2012) ("Admissions in the opposing party's pleadings . . . are admissible evidence and therefore can serve as the basis for summary judgment or opposition").  Third, even if the correspondent line was indeed canceled because of the fraud, The Loan Experts offers only conclusory argument, and no admissible evidence, that that cancellation contributed to The Loan Experts going out of business.  For all of these reasons, the Court rejects The Loan Experts's late assertion as to the correspondent line.

13

for his testimony about the list, does not say how he knows about the list or whether he ever saw it, and does not attach the list. Nor is there any evidence that any other lenders saw and relied on the list in refusing credit. Accordingly, the Court will ignore Nazari's testimony about the list.

Nazari also complains that "Flagstar sued The Loan Experts along with everyone else who was in any manner touched [sic] the transactions that were tainted with the McConville fraudulent scheme." Id. ¶ 10. But Flagstar filed suit in January 2010, see generally Compl., and Nazari testified that The Loan Experts went out of business in late 2008, Supp. Johnson Decl. Ex. V at 182:23-25. McAuley's testimony that "The Loan Experts would not have been able to get a replacement warehouse line after The Loan Experts was accused of committing fraud against its warehouse lender," McAuley Decl. ¶ 13, is therefore irrelevant.[5]

Moreover, although Nazari testified that he did call some other warehouse lenders to obtain an alternative warehouse line, see Supp. Johnson Decl. Ex. V at 200:24-25, he did not testify that those lenders knew of the fraud allegations, that they were aware of the blacklist that Flagstar allegedly put The Loan Experts on, or that they declined to extend funds to The Loan Experts because of the stigma of being a company that had been involved with a fraud.

There is therefore no genuine issue of fact as to whether the fraud caused a stigma that caused The Loan Experts to go out of business; it did not.

### 3. Conclusion as to Fraud and Negligent Misrepresentation Claims

Because the fraud allegations did not cause Flagstar to close the warehouse line of credit or create a stigma that caused The Loan Experts to go out of business, there is no genuine issue of material fact on the fraud and negligent misrepresentation claims, and the Court will enter judgment for Stewart Title on them.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS Stewart Title's Motion for Summary

//

---

[5] To the extent that McAuley's language about accusations of fraud refers not to the lawsuit but to the generalized stigma or even the list Nazari referred to, it also lacks foundation.

14

1 Judgment.

2 **IT IS SO ORDERED.**

4 Dated: October 9, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE